**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF TEXAS**

**LUFKIN DIVISION**

K.G., an individual,

Plaintiff,

v.

G6 HOSPITALITY, LLC;
G6 HOSPITALITY IP, LLC;
G6 HOSPITALITY PROPERTY, LLC;
G6 HOSPITALITY PURCHASING, LLC;
G6 HOSPITALITY FRANCHISING, LLC;
MOTEL 6 OPERATING, L.P.; and
MONTICELLO HOSPITALITY LLC
d/b/a MOTEL 6 MONTGOMERY – EAST,

Defendants.

Civil Action No.: ______________

JURY TRIAL DEMANDED

**COMPLAINT FOR DAMAGES**

COMES NOW Plaintiff K.G., by and through the undersigned counsel, and respectfully submits her Complaint for damages and makes the following averments.

**INTRODUCTION**

1. This is a civil action for damages brought pursuant to the Federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"). See 18 U.S.C. § 1595.

2. Plaintiff meets the definition of a sex trafficking victim as she was caused by her traffickers, beginning as a minor under the age of eighteen, to engage in commercial sex acts at the Motel 6 Montgomery – East, located at 1051 Eastern Boulevard, Montgomery, Alabama 36117 (the "Subject Hotel"), in 2014 through and inclusive of 2017. Plaintiff was born in 1999. She was fifteen years old when her trafficking at the Subject Hotel began in 2014, and she remained a minor under the age of eighteen for the majority of the period during which she was trafficked at the

Subject Hotel. After reaching the age of eighteen, Plaintiff was caused to continue to engage in commercial sex acts at the Subject Hotel, being induced to do so by her traffickers through means of force, threats of force, and coercion.

3. Defendants G6 Hospitality, LLC, G6 Hospitality IP, LLC, G6 Hospitality Property, LLC, G6 Hospitality Purchasing, LLC, G6 Hospitality Franchising, LLC, and Motel 6 Operating, L.P. (collectively, the "G6 Defendants") are the franchisors of the Motel 6 brand. Upon information and belief, they owned, operated or co-operated, controlled, and/or managed the Motel 6 brand and the system through which the Subject Hotel operated throughout the period during which Plaintiff was trafficked.

4. Defendant Monticello Hospitality LLC (the "Franchisee Defendant") is, upon information and belief, the franchisee of the Subject Hotel. Upon information and belief, the Franchisee Defendant owned, operated, or co-operated, controlled, and/or managed the Subject Hotel through the G6 system throughout the period during which Plaintiff was trafficked, and owned the real property on which the Subject Hotel is situated from in or about September 2012 until in or about August 2017, inclusive of the period during which Plaintiff was trafficked.

5. Section 1591 of the TVPRA criminalizes the sex trafficking of children. Where the person caused to engage in a commercial sex act is under the age of eighteen, no showing of force, fraud, or coercion is required. See 18 U.S.C. § 1591(a). Moreover, under § 1591(c), where a defendant had a reasonable opportunity to observe the minor victim, proof of the defendant's knowledge of the victim's age is not required. Section 1591 likewise criminalizes causing an adult to engage in commercial sex acts through means of force, threats of force, fraud, or coercion. Separately, § 1595 of the TVPRA provides victims of sex trafficking with a civil remedy against the traffickers or the beneficiaries of the sex trafficking crime. See 18 U.S.C. § 1595(a). More specifically, §

1595 provides for three distinct causes of action: (1) a claim against the trafficker who directly violated § 1591(a)(1); (2) a beneficiary claim against the trafficker who directly violated § 1591(a)(2); and (3) a beneficiary claim against a civil defendant benefiting from and receiving anything of value from participation in a venture which that person knew or should have known was engaged in sex trafficking. The subject lawsuit is applicable, in part, to prong three.

## PARTIES

6. Due to the sensitive, private, and potentially retaliatory nature of the allegations herein, and because Plaintiff was a minor victim of sex trafficking when her trafficking began, Plaintiff proceeds by her initials to protect her privacy and identity. Nationwide similarly situated Plaintiffs have proceeded by pseudonym or by their initials due to the foregoing.

7. Plaintiff K.G. is a resident of Alabama and was born in 1999.

8. Defendant G6 Hospitality, LLC is a for-profit Delaware limited liability company with its principal place of business in Carrollton, Texas.

9. Defendant G6 Hospitality IP, LLC is a for-profit Delaware limited liability company with its principal place of business in Carrollton, Texas.

10. Defendant G6 Hospitality Property, LLC is a for-profit Delaware limited liability company with its principal place of business in Carrollton, Texas.

11. Defendant G6 Hospitality Purchasing, LLC is a for-profit Delaware limited liability company with its principal place of business in Carrollton, Texas.

12. Defendant G6 Hospitality Franchising, LLC is a for-profit Delaware limited liability company with its principal place of business in Carrollton, Texas.

13. Defendant Motel 6 Operating, L.P. is a for-profit Delaware limited partnership with its principal place of business in Carrollton, Texas.

14. Defendant Monticello Hospitality LLC, upon information and belief doing business as Motel 6 Montgomery – East, is, upon information and belief, a for-profit Alabama limited liability company with its principal place of business located at 1051 Eastern Boulevard, Montgomery, Alabama 36117. Upon information and belief, said Defendant owned, operated, controlled, and/or managed the Subject Hotel through the G6 system throughout the period in which Plaintiff was trafficked, and owned the real property on which the Subject Hotel is situated from in or about September 2012, when it acquired the property, until in or about August 2017.

**JURISDICTION AND VENUE**

15. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves federal questions under the TVPRA.

16. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim — including the franchising and/or operational venture between the Franchisee Defendant and the G6 Defendants pursuant to which the Subject Hotel was operated, branded, and controlled — occurred, in substantial part, in Texas and in the Eastern District of Texas.

17. G6 Hospitality, LLC, G6 Hospitality IP, LLC, G6 Hospitality Property, LLC, G6 Hospitality Purchasing, LLC, G6 Hospitality Franchising, LLC, and Motel 6 Operating, L.P. have the same principal place of business, which is in Carrollton, Texas, within the Eastern District of Texas. Each of the G6 Defendants is therefore a resident of the Eastern District of Texas.

18. Venue is also proper as to the G6 Defendants pursuant to 28 U.S.C. § 1391(b)(1) because each of the G6 Defendants maintains their principal place of business in the Eastern District of Texas.

19. The franchising venture pursuant to which the Franchisee Defendant operated the subject motel occurred, in substantial part, in Texas because:

(a) upon information and belief, the Franchisee Defendant actively sought out a franchising relationship by contacting the G6 Defendants in Texas;

(b) on information and belief, the Franchisee Defendant acknowledged that the negotiation, execution, and acceptance of the franchising agreements occurred in the Eastern District of Texas;

(c) on information and belief, the Franchisee Defendant agreed that its ongoing performance of the franchising agreement would take place, in part, in the Eastern District of Texas;

(d) on information and belief, the franchising agreements had a choice of law provision selecting the law of Texas as the governing law;

(e) on information and belief, the franchising agreements required the Franchisee Defendant to report information to the G6 Defendants in Texas, including information about all incidents involving safety, security, public relations, or serious injuries to persons or property that occur at, or involve, the subject motels, including those involving sex trafficking victims like Plaintiff;

(f) on information and belief, the Franchisee Defendant agreed to submit all notices required under the franchising agreements to the G6 Defendants in the Eastern District of Texas;

(g) on information and belief, the Franchisee Defendant was required to attend training and meetings in Texas;

(h) the G6 Defendants dictated policies related to safety, security, human trafficking, and hotel operations at the subject motels from their principal place of business in the Eastern District of Texas;

(i) on information and belief, the Franchisee Defendant had an ongoing obligation to participate in centralized programs operated by the G6 Defendants from their principal place of business in the Eastern District of Texas;

(j) on information and belief, the Franchisee Defendant was required to purchase insurance on behalf of one or more Texas entities (the G6 Defendants);

(k) upon information and belief, reservation information for rooms at the subject motels passed through a system operated and managed by G6 from its principal place of business in Texas;

(l) upon information and belief, payment information for rooms at the subject motels passed through a system operated and managed by Franchisor in Texas;

(m) on information and belief, the benefit that the Franchisee Defendant received from room rentals was governed by the Texas franchising agreements;

(n) on information and belief, the Franchisee Defendant agreed to make all payments due under the franchising agreements at the G6 principal place of business in the Eastern District of Texas;

(o) the day-to-day operations of the subject motels were dictated, controlled, and influenced by many policies set and enforced by the G6 Defendants from their principal place of business in Carrollton, Texas;

(p) on information and belief, the Franchisee Defendant signed a software licensing agreement with the G6 Defendants for the property management software the G6 Defendants required the Franchisee Defendant to use when operating the subject motels, including, but not limited to, when booking rooms at the hotel and processing payment for those rooms; and

(q) on information and belief, the Franchisee Defendant agreed to file any lawsuit arising from the licensing agreements in the Eastern District of Texas and waived personal jurisdiction and venue objections.

## FACTS

### I. Plaintiff Was a Victim of Unlawful Sex Trafficking, Beginning as a Minor, at the Subject Hotel Owned, Operated, Managed, and Controlled by Defendants.

20. In 2014 through and inclusive of 2017, Plaintiff was trafficked at the Subject Hotel by her traffickers. Plaintiff was caused to engage in commercial sex acts at the Subject Hotel beginning when she was fifteen years old and under the age of eighteen; she remained a minor for the majority of the period during which she was trafficked at the Subject Hotel; and she was also trafficked at the Subject Hotel after reaching the age of eighteen in 2017, when Plaintiff was caused to continue to engage in commercial sex acts at the Subject Hotel, being induced to do so by her traffickers through means of force, threats of force, and coercion.

21. Plaintiff was trafficked by two adult male individuals known to Plaintiff as “Deogo” and “Carl,” who operated a commercial sex trafficking enterprise at the Subject Hotel. At times, three other female victims were trafficked by the same trafficking enterprise during the same period, including at the Subject Hotel.

22. The rooms used for the trafficking of Plaintiff at the Subject Hotel were rented by her traffickers, or those acting at their direction.

23. At the direction of her traffickers, Plaintiff solicited commercial sex in and around the premises of the Subject Hotel dressed in skimpy, sexually provocative, and revealing clothing, in open and plain view of hotel staff and the public and for a large portion of said time with overt appearance of a minor.

24. Upon information and belief, Plaintiff's traffickers, at times, gave extra money to some staff of the Subject Hotel; Plaintiff perceived these payments to be bribes, made so that the staff receiving them would look the other way thereby enabling and facilitating the subject trafficking of Plaintiff.

25. Because Plaintiff was under the age of eighteen when her trafficking at the Subject Hotel began, no showing of force, fraud, or coercion is required to establish that she was a victim of sex trafficking under 18 U.S.C. § 1591 as to that period.

26. Nevertheless, and including after Plaintiff reached the age of eighteen, her traffickers did in fact use force, threats of force, and coercion against Plaintiff to cause her to engage in commercial sex acts, including by physically assaulting her — punching and strangling her, and leaving her with visible injuries including black eyes, a busted lip, and bruising and by threatening Plaintiff and her loved ones.

27. Plaintiff was advertised by her traffickers for commercial sex acts online, including on Backpage and ListCrawler, and upon information and belief using internet/Wi-Fi services available at the Subject Hotel.

28. Plaintiff was compelled to engage in commercial sex acts with adult sex buyers at the Subject Hotel on a repeated and recurring basis, resulting in a steady stream of adult male sex buyers to and from the rooms rented for her trafficking.

29. Loud suspicious noises emanated from the rooms used for the trafficking of Plaintiff, audible to hotel staff and other guests of the Subject Hotel.

30. While being trafficked at the Subject Hotel, Plaintiff bore visible signs of physical abuse, including black eyes, a busted lip, and bruising; there were obvious signs of illegal drug use in and

about the rooms used for her trafficking; and Plaintiff regularly moved about the premises of the Subject Hotel while visibly impaired.

31. The trafficking of Plaintiff at the Subject Hotel continued through and inclusive of 2017.

32. The physical, behavioral, and psychological effects of sex trafficking on its victims — and on minor victims in particular — are well-recognized in the hospitality industry. These effects were obvious and apparent to the staff and management of the Subject Hotel, including effects on Plaintiff's appearance, her demeanor, her movements throughout the hotel, her visible injuries — including black eyes, a busted lip, and bruising — and her interactions with her traffickers, hotel staff, and others. Observing these effects provided Defendants with notice that Plaintiff was being continually subjected to commercial sexual exploitation, coercion, and control.

## II. Sex Trafficking in the Hotel Industry Is a Well-Known and Pervasive Problem.

33. The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what the G6 Defendants and the Franchisee Defendant knew or should have known regarding the trafficking at the Subject Hotel, including the trafficking of Plaintiff.

34. Sex slavery is pervasive in the United States, and hotels are the primary place where it happens. For years, sex traffickers have been able to reap their profits with little risk when operating within hotels. In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.

35. The trafficking of minors for commercial sex in hotels is a particular and well-documented feature of this problem. The hospitality industry, including Defendants, has long been on notice that children and other vulnerable young people — who are targeted by traffickers precisely because of their vulnerability — are sold for sex in budget hotels and motels.

36. Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.

37. The signs of sex trafficking in a hotel environment — and the signs of minor sex trafficking in particular — follow well-established patterns and can easily be detected by appropriately trained staff.

38. Toolkits specific to the hotel industry have been developed which help hotel staff in every position identify and respond to signs of sex trafficking. From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel. These include, among others, the presence of an unaccompanied minor residing at a hotel; a young woman whose rooms are booked and paid for in cash by an unrelated adult on a recurring basis; and a guest exhibiting signs of physical abuse or commercial sexual activity.

39. The relationship between a pimp and a prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subject to force, fraud, or coercion — and that any minor engaged in commercial sex is, as a matter of federal law, a victim of sex trafficking. Defendants understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendants knew or should have known that signs of commercial sex activity in their hotels were in fact signs of sex trafficking.

40. All Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing the Subject Hotel, when enacting and enforcing policies and procedures applicable to the Subject Hotel and when training, educating, and supervising the staff of the Subject Hotel.

41. The most effective weapon against sexual exploitation and human trafficking is education and training. The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Hotel employees who have undergone training are more aware of trafficking when it happens and are more willing to report it than those who have not been trained. If hotel companies do nothing to raise awareness or to prevent trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place.

42. Given the prevalence of human trafficking in hotels and the abundance of information about how franchisors, owners, operators and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of a hotel chain to continue generating revenue from traffickers without taking reasonable steps to identify and prevent trafficking in its hotels is a decision to continue generating revenue while failing to take reasonable steps to identify and prevent sex trafficking.

43. Each of the Defendants had a responsibility to adopt, implement, and adequately enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to the signs of sex trafficking, including the trafficking of minors.

## III. Sex Trafficking Has Long Been Prevalent at G6 Branded Properties, and Defendants Have Known About It.

44. Defendants have long been on notice of the pervasive problem of sex trafficking in the hotel industry. On information and belief, each of the Defendants has also long been on notice of sex trafficking occurring at Motel 6 properties including the Subject Hotel.

45. G6 branded properties include both Motel 6 and Studio 6 properties.

46. Use of G6 branded properties for sex trafficking is well known to the G6 Defendants. Motel 6 hotels are one of the five chains most frequently identified as a site of sex trafficking in federal criminal complaints.

47. A Los Angeles Motel 6 became such a hub for human trafficking and other criminal activity that the G6 Defendants paid to settle a public nuisance lawsuit filed by the City of Los Angeles. G6 Defendants knew staff at its branded properties were facilitating sex trafficking and that it was generating revenue through policies that encouraged sex traffickers to operate at G6 brand properties.

48. The settlement required the G6 Defendants to change policies that were facilitating sex trafficking. Based on information and belief, G6 has failed to adequately implement and enforce such changes.

49. Motel 6 properties are frequently located near major roadways and interstate highways, making them attractive venues for trafficking and compelled prostitution. The Subject Hotel is itself located on the Eastern Boulevard corridor in Montgomery, Alabama, in immediate proximity to Exit 6 of Interstate 85, a major highway corridor through central Alabama.

50. Numerous publicized incidents demonstrate the use of G6 branded hotels for sex trafficking — including the sex trafficking of minors — and establish that Defendants knew, or should have known, of the use of G6 branded hotels for sex trafficking. Among notable incidents involving the use of Motel and Studio 6 hotels for sex trafficking: in late 2003, a trafficker operated a sex trafficking venture at a Motel 6 in Connecticut; in April 2009, a sex trafficking venture operated out of a Motel 6 in Toledo, Ohio; in approximately September 2011, sex traffickers sold minors for sex at a Motel 6 in Toledo, Ohio; from approximately 2012 through October 2014, two men engaged in criminal sex trafficking of children at a Motel 6 in Harvey, Illinois; in December 2012,

the FBI investigated human trafficking at a Motel 6 in Madison, Alabama; in December 2012, the Orange County Human Trafficking Task Force busted a criminal enterprise selling women for sex out of a Motel 6 in Anaheim, California; in March 2014, a trafficker was charged with selling a seventeen year old girl for sex at a Motel 6 in Roseville, Minnesota; in March 2015, a seventeen year old girl was rescued from a Motel 6 in North Charleston, South Carolina by DHS special agents after being sold for sex, beaten, and starved; in March 2015, two men were arrested for sex trafficking a fifteen year old girl at a Motel 6 in Austin, Texas; over a fourteen month period ending in approximately April 2015, a Motel 6 in Warwick, Rhode Island had seventy-five arrests for crimes including sex trafficking; and in June 2015, a married couple was indicted for sex trafficking minor children out of a Motel 6 in Everett, Washington.

**IV. Defendants had actual and constructive knowledge of widespread and ongoing sex trafficking at the Subject Hotel.**

51. The G6 Defendants were specifically aware that sex trafficking was widespread, in general, and knew, or should have known that same was occurring at the Subject Hotel during and prior to the time that Plaintiff was trafficked there.

52. Upon information and belief, Defendants knew or should have known about the widespread trafficking at the Subject Hotel based on:

(a) the obligation of hotel staff and hotel management to report suspected criminal activity including sex trafficking to the G6 Defendants;

(b) the payments of money that Plaintiff's traffickers, at times, gave to some staff of the Subject Hotel, which Plaintiff perceived to be bribes;

(c) the fact that hotel staff observed the obvious signs of the trafficking of Plaintiff, including her visible injuries; and

(d) other sources of information available to Defendants.

53. All knowledge from the staff at the Subject Hotel is imputed to G6.

**V. Defendants knew Plaintiff was being trafficked at the Subject Hotel because of the obvious signs of her trafficking.**

54. During the period that Plaintiff was trafficked at the Subject Hotel, there were signs obvious to hotel staff and management that she was being trafficked, including:

(a) A visibly underage girl — fifteen years old when her trafficking began — on the premises of the Subject Hotel during the majority of the subject trafficking period, unaccompanied by any parent or guardian, in the company of unrelated adult males;

(b) The rooms used for the trafficking were rented by the traffickers, or those acting at their direction, on a repetitive and recurring basis;

(c) Steady foot traffic of adult male sex buyers to and from the rooms rented for the trafficking of Plaintiff;

(d) At the direction of her traffickers, Plaintiff openly solicited commercial sex in and around the premises of the Subject Hotel, including in and around the lobby, dressed in skimpy, sexually provocative, and revealing clothing, in open and plain view of hotel staff and the public - and for a lengthy period thereof with overt appearance of a minor;

(e) Plaintiff was regularly seen by hotel staff in and about the Subject Hotel with visible signs of physical abuse, including black eyes, a busted lip, and bruising;

(f) Plaintiff regularly moved about the premises of the Subject Hotel while visibly impaired;

(g) Obvious signs of illegal drug use in and about the rooms used for the trafficking;

(h) Loud suspicious emanating from the rooms used for the trafficking, audible to hotel staff and other guests;

(i) Plaintiff was advertised by her traffickers for commercial sex acts online including on Backpage and ListCrawler, upon information and belief using internet/Wi-Fi available at the Subject Hotel;

(j) Upon information and belief, Plaintiff's traffickers, at times, gave payments of money to some staff of the Subject Hotel, which Plaintiff perceived to be bribes;

(k) Staff of the Subject Hotel observed the foregoing red flags, yet took no action to stop the trafficking, report it, or intervene; and

(l) Other commonly known sex trafficking red flags which Defendants knew or should have known of had anti-trafficking measures been timely and properly implemented at the hotel.

55. Hotel staff and management observed, or should have observed, the foregoing obvious signs of sex trafficking including items set forth in the preceding paragraph.

56. When being trafficked at the Subject Hotel in 2014 through and inclusive of 2017, Plaintiff was aware that staff of the Subject Hotel observed Plaintiff, her traffickers, as well as a frequent procession of sex buyers going in and out of the subject rented rooms, contemporaneous with other signs and indicators of trafficking occurring on the subject premises.

57. Plaintiff knows that some of the individuals that witnessed and observed red flags indicative of sex trafficking were staff members in that the staff were readily identifiable to Plaintiff either by her knowing of the individual and/or by means of the staff wardrobe/nametag/hotel logo and/or

by means of a staff member being in an employee restricted area and/or by means of a staff member being stationed at the front desk of the Subject Hotel.

58. Based upon information and belief, multiple employees at the Subject Hotel, including management-level employees and front desk and housekeeping staff, observed, or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

59. Plaintiff was repeatedly and recurringly present at, and moved openly about, the Subject Hotel over extended and recurring stays spanning approximately two and a half years. Throughout this period, Plaintiff's youthful appearance was open and apparent to the staff and management of the Subject Hotel, who observed her regularly and at close range. Defendants accordingly knew or should have known that Plaintiff was a minor for the majority of the period during which she was trafficked at the Subject Hotel.

60. As such, Defendants knew or should have known that Plaintiff was being trafficked at the Subject Hotel.

61. The foregoing red flags were not merely indicators of commercial sex activity but were indicators of sex trafficking specifically because they included the presence of a young, unaccompanied girl — initially a minor — engaged in commercial sexual activity while bearing visible injuries, whose rooms were booked and paid for often in cash or by prepaid credit card on a recurring basis. Any commercial sex act involving a minor is sex trafficking as a matter of federal law. These signs, individually and collectively, provided Defendants with notice not only of sex trafficking activity generally at the Subject Hotel, but specifically that Plaintiff was being trafficked.

**VI. Defendants actively facilitated sex trafficking at the Subject Hotel, including the trafficking of Plaintiff.**

62. Defendants had both actual and constructive knowledge of the trafficking of Plaintiff at the Subject Hotel because the trafficking was, in part, a consequence of Defendants facilitating her trafficking at the Subject Hotel.

63. The rooms used for the trafficking of Plaintiff were rented and/or renewed by the traffickers, or those acting at their direction, on a repeated, recurring basis, paid for in cash, in 2014 through and inclusive of 2017.

64. Defendants rented rooms to individuals they knew or should have known were engaged in sex trafficking, and of Plaintiff in particular, in violation of the TVPRA.

65. The Franchisee Defendant, through its staff, rented rooms used for the trafficking of Plaintiff, collected cash payment for those rooms, and interacted face-to-face with Plaintiff and her traffickers on a regular and repeated basis over a period of years. In addition, some staff of the Subject Hotel, at times, accepted payments of money from Plaintiff's traffickers, which Plaintiff perceived to be bribes. These were not passive observations of trafficking from a distance; the Franchisee Defendant was involved in the commercial transactions that provided the venue for the trafficking of Plaintiff and, through some of its staff, at times accepted money directly from Plaintiff's traffickers.

66. Defendants knowingly benefited from the sex trafficking of Plaintiff at the Subject Hotel by receiving payment for the rooms rented that were used for sex trafficking, including as to the Plaintiff, in violation of the TVPRA in 2014 through and inclusive of 2017.

67. The rooms at the Subject Hotel that were used for the sex trafficking of the Plaintiff were rented by the traffickers, or those acting at their direction. Discovery will reveal additional facts

concerning the manner in which the traffickers and those acting at their direction booked rooms at the Subject Hotel that were used for the sex trafficking of the Plaintiff in violation of the TVPRA:

(a) the identity and name under which each room was booked or renewed;

(b) whether staff of Defendants required for each booking that the renter show their identification; and

(c) the identity of the staff of the Subject Hotel to whom Plaintiff's traffickers, at times, gave payments of money.

68. Defendants allowed the traffickers and those acting at their direction on the subject premises to continue to pay for rooms rented at the Subject Hotel during the time that Plaintiff was being sex trafficked there in violation of the TVPRA.

69. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking in general and, on information and belief, at the Subject Hotel, the Franchisee Defendant continued renting rooms used to sexually exploit Plaintiff.

70. The Franchisee Defendant knew or should have known that Plaintiff was being trafficked and, despite this, benefited from continued association with her traffickers by providing a venue for her exploitation.

71. The Franchisee Defendant also facilitated trafficking at the Subject Hotel, including the trafficking of Plaintiff, in ways including:

(a) allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking, including the trafficking of minors;

(b) inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

(c) at times accepting payments of money from Plaintiff's traffickers, which Plaintiff perceived to be bribes, while permitting the trafficking to continue unimpeded;

(d) choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, and/or applicable franchisor policies and procedures, notwithstanding the obvious red flags of the trafficking of Plaintiff observable to staff; and

(e) creating an environment where the traffickers did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate openly — including renewing rooms in cash on a day-by-day basis for extended recurring stays over a period of years, having Plaintiff solicit in and around the premises including the lobby, and, at times, paying money to some staff of the Subject Hotel — without concern for detection or interference by the hotel staff.

72. Upon information and belief, the G6 Defendants participated directly in aspects of the operation of the Subject Hotel that influenced whether and to what extent trafficking occurred at the hotel, including but not limited to the trafficking of Plaintiff.

73. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Subject Hotel, G6 continued renting rooms used to sexually exploit victims, including Plaintiff.

74. G6 knew or should have known that Plaintiff was being trafficked and, despite this, benefited from continued association with her traffickers by providing hotel rooms and related services used for her exploitation.

75. Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the Subject Hotel, the G6 Defendants continued participating in a venture at the

Subject Hotel, with the Franchisee Defendant and hotel staff, in a way that they knew or should have known would lead to additional sex trafficking, including but not limited to by the following:

(a) the G6 Defendants adopted inappropriate and inadequate practices for selecting, training, supervising, managing, and disciplining franchisees, operators, and hotel staff regarding issues related to human trafficking;

(b) the G6 Defendants provided inadequate training on issues related to human trafficking and unreasonably delayed providing training;

(c) the G6 Defendants adopted a safety and security budget and safety and security practices that were clearly insufficient considering the known problem of sex trafficking at Motel 6 properties;

(d) the G6 Defendants failed to ensure that franchisees, operators, and hotel staff reported or responded to criminal activity including sex trafficking appropriately;

(e) the G6 Defendants continued to use policies, protocols, and practices that had been shown to lead to widespread trafficking at G6 branded properties, including the Subject Hotel;

(f) the G6 Defendants attracted traffickers by maintaining venues where access was easy, risks of interference were low, and traceability was minimal;

(g) the G6 Defendants allowed traffickers to reserve and pay for rooms using cash, on a day-by-day basis, which provided relative anonymity and non-traceability; and

(h) the G6 Defendants provided traffickers with access to internet services in a manner that the G6 Defendants knew or should have known would be used to facilitate trafficking by promoting commercial sex services online.

76. If G6 had exercised reasonable diligence when operating the Subject Hotel and in the areas where it retained control, G6 would have prevented the Subject Hotel from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Plaintiff. Instead, G6 engaged in a course of conduct that facilitated widespread and ongoing sex trafficking, including the trafficking of Plaintiff.

**VII. Defendants knowingly benefited from participation in a venture that they knew or should have known was engaged in sex trafficking.**

77. Through the conduct described above, Defendants knowingly benefited from engaging in a venture with the traffickers and with one another.

78. The repeated rental transactions between the traffickers (and those acting at their direction) and the Subject Hotel, often by cash and prepaid credit card, which occurred during the time that Plaintiff was trafficked were colored by overt indicators of sex trafficking — including Plaintiff's young, unaccompanied presence over recurring extended stays spanning approximately two and a half years, her visible injuries including black eyes, a busted lip, and bruising, her open solicitation in and around the premises including the lobby, the steady foot traffic of adult male sex buyers, the loud noises emanating from the rooms within earshot of staff, and the obvious signs of illegal drug use — such that said Defendants knew, or should have known, that they were renting rooms to, and facilitating, individuals engaged in the sex trafficking of Plaintiff in violation of the TVPRA. Moreover, the relationship between Plaintiff's traffickers and the Subject Hotel went well beyond arms-length room rental transactions: Plaintiff's traffickers, at times, gave payments of money directly to some staff of the Subject Hotel, which Plaintiff perceived to be bribes, and, upon information and belief, the staff who received those payments accepted them and in exchange permitted the trafficking to continue unimpeded. This continuous business relationship, and these

direct payments, give rise to the inference of an agreement — tacit and express — between the traffickers and the Subject Hotel notwithstanding that the traffickers were engaged in sex trafficking.

79. A venture existed between the traffickers and the Franchisee Defendant at the subject premises by means of rooms repeatedly rented for the trafficking, which rooms Defendants knew, or should have known, were being used for the sex trafficking of Plaintiff in violation of the TVPRA, and which the parties wished to continue for profit.

80. A venture also existed between the Franchisee Defendant and the G6 Defendants pursuant to which the Subject Hotel was operated, branded, and controlled.

81. Relative to the Subject Hotel, a continuous business relationship existed between the Franchisee Defendant and the traffickers' sex trafficking business, in part, in that said Defendant provided assistance, support, or facilitation to the traffickers and individuals it knew or should have known were involved in sex trafficking on the premises, in violation of the TVPRA, including as to the Plaintiff herein; and in doing so facilitated the trafficking venture's success.

82. Relative to the Subject Hotel, a continuous business relationship existed between the G6 Defendants and the traffickers' sex trafficking business, in part, in that said Defendants provided assistance, support, or facilitation to the traffickers and individuals they knew or should have known were involved in sex trafficking on the premises in violation of the TVPRA, including as to the Plaintiff herein; and in doing so facilitated the trafficking venture's success.

83. Through the conduct described above, each Defendant also knowingly benefited from engaging in a commercial venture with other Defendants operating the Subject Hotel. Defendants associated with one another and with the hotel staff to operate the Subject Hotel. Each Defendant received financial benefits from operating the Subject Hotel, including revenue generated

specifically by renting rooms used for the trafficking. They engaged in revenue sharing and had a common incentive to maximize revenue. By participating in a venture that facilitated sex trafficking, Defendants also benefitted by keeping operating costs low and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade.

## VIII. The Operators and Staff of the Subject Hotel Acted as Actual Agents of G6.

84. G6 is vicariously liable for the acts, omissions, and knowledge of the Franchisee Defendant and the staff of the Subject Hotel.

85. The G6 Defendants subjected the Franchisee Defendant to detailed standards and requirements regarding the operation of the Subject Hotel through the franchising agreements, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by the G6 Defendants.

86. The G6 Defendants obscure the full extent of control they exercise over their franchisees by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. Upon information and belief, the standards that the G6 Defendants imposed on the Franchisee Defendant:

(a) did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools used at the Subject Hotel;

(b) covered virtually all aspects of hotel operations, including internal operating functions;

(c) dictated the specific manner in which the operators and hotel staff must carry out most day-to-day functions at the Subject Hotel; and

(d) significantly exceeded what was necessary for G6 to protect its registered trademarks.

87. In addition to the foregoing, upon information and belief, G6 exercised and reserved the right to exercise control over the day-to-day operation of the Subject Hotel, including:

(a) requiring operators and management to participate in mandatory training programs covering all aspects of hotel operations;

(b) controlling training content and methods for hotel staff;

(c) designating approved vendors and prohibiting purchases from non-approved sources;

(d) requiring use of specific technology, hardware, software, and property management systems;

(e) setting required staffing levels;

(f) establishing detailed job descriptions and dictating which positions must perform which tasks;

(g) setting requirements for hiring, overseeing discipline, and termination decisions;

(h) controlling channels for guest complaints and directly participating in responses;

(i) generating reports and analysis of guest complaints and online reviews;

(j) requiring use of a Guest Relations Application owned and operated by G6;

(k) regularly auditing books and records;

(l) conducting frequent and unscheduled inspections;

(m) retaining the right to issue fines, require corrective action plans, and terminate franchising agreements;

(n) controlling all marketing and prohibiting unauthorized online presence; and

(o) imposing detailed recordkeeping and reporting requirements regarding virtually all aspects of hotel operations.

88. Upon information and belief, the G6 Defendants participated directly in aspects of the operation of the Subject Hotel that influenced whether and to what extent trafficking occurred, including:

(a) publicly assuming responsibility and control over the human trafficking response of all Motel 6 and Studio 6 properties;

(b) retaining control over when branded hotels would share information with law enforcement;

(c) creating a reporting hotline for hotel staff and franchisees to report suspected human trafficking and determining when issues should be escalated;

(d) retaining control over determining which hotels needed additional training based on high risk of trafficking;

(e) retaining control to terminate staff or franchising agreements based on the response to human trafficking;

(f) retaining control over all training on how to spot and prevent human trafficking;

(g) maintaining a Safety & Security Team and Critical Incident Rapid Response Team for investigating potential criminal incidents;

(h) adopting, enforcing, and monitoring policies and codes of conduct related to human trafficking; and

(i) maintaining control over internet services at the Subject Hotel, including whether sites used to solicit sex trafficking victims would be accessible.

89. G6 directly participated in and retained day-to-day control over renting rooms at the Subject Hotel by, among other things:

(a) controlling all details of the guest reservation, check-in, and payment processes;

(b) directly making reservations and accepting payment through a central reservation system without requiring franchisee approval;

(c) establishing and maintaining a brand-wide guest rewards and loyalty program;

(d) controlling room rates, required discounts, mandatory fees, and rewards programs;

(e) controlling and restricting the ability of operators and staff to refuse or cancel a reservation;

(f) controlling policies and procedures regarding check-in, payment and identity verification;

(g) collecting, retaining, monitoring, and analyzing detailed data about every guest; and

(h) exercising and retaining the right to exercise control over virtually all aspects of room reservations and payment.

**IX. G6 Defendants are jointly responsible for the trafficking of Plaintiff.**

90. All the G6 Defendants were participants in a joint venture, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations of the other participants in the joint venture.

91. Upon information and belief, operation of the Subject Hotel was part of a single unified operation by G6 Defendants. Upon information and belief, all G6 Defendants shared a common

parent company, were subject to joint control, and operated as an integrated enterprise and/or as alter-egos.

**X. Causation.**

92. The venture or ventures in which each Defendant participated were direct, producing, and proximate causes of the injuries and damages to Plaintiff.

93. Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to Plaintiff for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

**XI. Tolling of Limitations.**

94. Plaintiff was under the control, coercion, and manipulation of her traffickers through and inclusive of 2017, and as a result, Plaintiff lacked the information and capacity to understand her injuries and their legal causes.

95. Thus, Plaintiff did not discover and could not reasonably have discovered the legal cause of her injury — through no fault of her own — and lacked the information and understanding to bring a claim because she did not know both her injury and the cause of her injury. This lack of information was a direct result of Plaintiff being kept under the control, coercion, and manipulation of her traffickers, which Defendants facilitated.

96. At the time Plaintiff was harmed, she did not know that she was the victim of human trafficking as that term is defined by law, that her injury arose from being trafficked at Defendants' hotel, or that she was the victim of a venture involving Defendants, and she did not discover and was not in a position to discover the legal cause of her injury for years after her trafficking ended.

97. To the extent Defendants assert an affirmative defense of limitations, Plaintiff invokes the doctrine of equitable tolling because, as a result of being a victim of trafficking, Plaintiff faced

extraordinary circumstances, which arose through no fault of her own, that prevented her from filing a lawsuit, and those circumstances did not end more than 10 years before Plaintiff filed this lawsuit. Among other things, Plaintiff was subjected to physical violence — including punching and strangulation — and threats against herself and her loved ones, and reasonably feared retaliation by her traffickers if she came forward.

98. While under the control of her traffickers, Plaintiff did not have the freedom to investigate her claims, to identify those responsible, or to seek legal representation necessary to pursue her legal rights. Plaintiff could not have pursued her claims while under the active control of her traffickers despite the exercise of ordinary diligence.

99. To the extent Defendants assert an affirmative defense of limitations, Plaintiff invokes the continuing violation doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct by Defendants.

100. Plaintiff was subject to continuous trafficking at the Subject Hotel through and inclusive of 2017, which is not more than 10 years before Plaintiff brings this lawsuit. This continuous trafficking resulted from Defendants' facilitation of trafficking at the Subject Hotel as described above.

101. The TVPRA's ten-year limitations period, 18 U.S.C. § 1595(c), is subject to equitable tolling. See Arellano v. McDonough, 598 U.S. 1, 6–7 (2023), in which the Court emphasized the "hornbook law" presumption that federal statutes of limitations are subject to tolling unless Congress clearly states otherwise. See also Doe v. G6 Hospitality Franchising LLC et al., No. 3:2025-cv-00770, Document 53 (N.D. Tex. 2025).

102. Furthermore, Plaintiff's minority during a substantial portion of her trafficking additionally and independently supports the timeliness of this action. Pursuant to 18 U.S.C. § 1595(c), a civil

action under the TVPRA must be brought not later than the later of (1) ten years after the cause of action arose, or (2) ten years after the victim reaches eighteen years of age, if the victim was a minor at the time of the alleged offense.

103. Plaintiff was a minor under the age of eighteen at the time of the offenses alleged herein. Plaintiff, born in 1999, was approximately fifteen years old when her trafficking at the Subject Hotel began in 2014 and remained a minor under the age of eighteen for the majority of the period during which she was trafficked at the Subject Hotel.

104. Plaintiff reached the age of eighteen in 2017. Pursuant to 18 U.S.C. § 1595(c)(2), Plaintiff may bring this action at any time within ten years after reaching the age of eighteen. This action, filed within ten years of Plaintiff reaching the age of eighteen, is therefore timely in its entirety.

105. The severe and continuing psychological trauma inflicted upon Plaintiff by her trafficking — including trauma requiring inpatient behavioral health treatment following the end of her trafficking, and including depression, anxiety, and PTSD — further impaired Plaintiff's ability to timely discover, understand, and pursue her legal rights and claims against Defendants.

106. Plaintiff acted with reasonable diligence in investigating and pursuing her claims once she was free of her traffickers' control and capable of doing so.

107. Accordingly, this action is timely under 18 U.S.C. § 1595(c)(2) and, in the alternative, under the doctrines of equitable tolling, the discovery rule, the continuing violation doctrine, and tolling by duress, and no portion of Plaintiff's claims is barred by limitations.

## CAUSES OF ACTION — SEX TRAFFICKING UNDER THE TVPRA

108. Plaintiff incorporates all other allegations.

**COUNT I. Cause of Action: Beneficiary Liability under § 1595(a) of the TVPRA (all Defendants)**

109. Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. §§ 1591 and 1595(a) and is entitled to bring a civil action against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA. Because Plaintiff was under the age of eighteen when her trafficking at the Subject Hotel began, any commercial sex act in which she was caused to engage while a minor constituted sex trafficking under 18 U.S.C. § 1591 without regard to force, fraud, or coercion. Thereafter, Plaintiff was caused to engage in commercial sex acts through means of force, threats of force, and coercion, in violation of 18 U.S.C. § 1591.

110. Through acts and omissions, and participation, described throughout this Complaint, Defendants received a financial benefit from participating in a venture with traffickers, including Plaintiff's traffickers, even though Defendants knew or should have known that these traffickers were engaged in violations of 18 U.S.C. § 1591(a)(1) and 18 U.S.C. § 1591(a)(2). Thus, Defendants are liable as a beneficiary under 18 U.S.C. § 1595(a).

111. Through the acts and omissions described throughout this Complaint, the G6 Defendants received a financial benefit from participating in a venture with the Franchisee Defendant regarding the operations of the Subject Hotel even though the G6 Defendants knew or should have known that this venture was violating 18 U.S.C. §§ 1591(a) and 1595(a).

112. Defendants' participation in these ventures combined with the traffickers' conduct, and the other unlawful acts and omissions alleged in this Complaint, to cause Plaintiff to suffer substantial physical and psychological injuries and other damages because of being trafficked at the Subject Hotel.

**COUNT II. Cause of Action: Vicarious Liability for TVPRA Violations (G6 Defendants)**

113. Under the TVPRA and the federal common law, each member of a joint venture is vicariously liable for the acts and omissions of all other members of that joint venture.

114. Under the TVPRA and the federal common law, an entity is vicariously liable for the acts and omissions of its alter-egos.

115. The Franchisee Defendant acted as the actual agent of the G6 Defendants when operating the Subject Hotel.

116. Through the acts and omissions described throughout this Complaint, the G6 Defendants exercised or retained the right to exercise systematic and day-to-day control over the means and methods used to operate the Subject Hotel.

117. The G6 Defendants are vicariously liable for the TVPRA violations of the Franchisee Defendant and the subagents thereof.

**DAMAGES**

118. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and will continue to suffer substantial damages.

119. Defendants are jointly and severally liable for all past and future damages sustained by Plaintiff.

120. Defendants' failure to timely and properly prevent the sex trafficking or timely intervene regarding same was a proximate cause of the injuries and damages sustained by Plaintiff in this case including, but not limited to, being the victim of sex trafficking — beginning as a minor — at the Subject Hotel and suffering personal injury and the trauma physically and mentally of being caused to engage in commercial sex with numerous adult sex buyers while being trafficked, being physically assaulted by her traffickers — including being punched and strangled and suffering

visible black eyes, a busted lip, and bruising — as well as all residual injuries suffered, including PTSD. Following the end of her trafficking, Plaintiff required inpatient behavioral health treatment for approximately two months.

121. Plaintiff being sex trafficked, beginning as a minor, at the Subject Hotel was a proximate cause, competent cause, and substantial factor in causing her severe and permanent injuries including but not limited to personal injuries including the horror of being a victim of sex trafficking beginning as a child as well as significant levels of psychological trauma due to the levels of abuse she was caused to endure during the time she was trafficked. This trauma led to depression, anxiety disorders, and PTSD, which in turn affects daily functioning.

122. As a direct and proximate result of Defendants' failure to act, mandate, establish, and execute anti-trafficking measures and modify their anti-trafficking efforts at the Subject Hotel, Plaintiff was sex trafficked, sexually exploited, and victimized repeatedly, beginning while a minor.

123. As a consequence of being sex trafficked at the Subject Hotel, Plaintiff suffered and will continue to suffer substantial economic, physical, mental, emotional, psychiatric, and psychological injuries as the result of being trafficked and sexually exploited at the Subject Hotel in violation of 18 U.S.C. § 1591.

124. Plaintiff is entitled to be compensated for personal injuries and economic damages, including:

(a) Actual damages (until trial and in the future);

(b) Incidental and consequential damages (until trial and in the future);

(c) Mental anguish and emotional distress damages (until trial and in the future);

(d) Lost earnings and lost earning capacity (until trial and in the future);

(e) Necessary medical expenses (until trial and in the future);

(f) Life care expenses (until trial and in the future);

(g) Physical pain and suffering (until trial and in the future);

(h) Physical impairment (until trial and in the future);

(i) Exemplary/Punitive damages;

(j) Attorneys' fees as allowed by law;

(k) Costs of this action; and

(l) Pre-judgment and all other interest recoverable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as identified in the above-referenced Counts and as follows:

(a) All available compensatory damages for the described losses with respect to the above causes of action;

(b) Past and future emotional distress;

(c) Consequential and/or special damages;

(d) All available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

(e) Physical pain and suffering;

(f) Disgorgement of profits obtained through unjust enrichment;

(g) Restitution;

(h) All damages allowable under the TVPRA;

(i) Attorneys' fees as allowed by law;

(j) Punitive damages with respect to each cause of action;

(k) Costs of this action;

(l) Prejudgment and all other interest recoverable; and

(m) Such other and further relief to which Plaintiff may, in law or in equity, show herself to be justly entitled.

**DEMAND FOR JURY TRIAL**

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: July 16, 2026

Respectfully submitted,

/s/ Jason Byrd
Jason Byrd
THE BYRD LAW FIRM
448 Orleans
Beaumont, TX 77701
Telephone: (409) 924-0660
Facsimile: (409) 924-0035
jason@txbyrd.com

Randolph Janis, Esq.
DOUGLAS & LONDON, P.C.
One State Street, 35th Floor
New York, NY 10004
Telephone: (212) 566-7500
Facsimile: (212) 566-7501
rjanis@douglasandlondon.com

Chloe Makowsky, Esq.
DOUGLAS & LONDON, P.C.
One State Street, 35th Floor
New York, NY 10004
Telephone: (212) 566-7500
Facsimile: (212) 566-7501
cmakowsky@douglasandlondon.com

Attorneys for Plaintiff